**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **PHILADELPHIA INDEMNITY INS. CO.,** *et al.*, | |
| **Plaintiffs,** | **Civil No.: 1:20-cv-00669-JRR** |
| **v.** | |
| **MARKEL INS. CO.,** *et al.*, | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

This case arises out of an ongoing dispute between a daycare franchisor and franchisee and their respective insurance companies, Philadelphia Indemnity Insurance Company ("Philadelphia Indemnity") and Markel Insurance Company ("Markel").

This matter comes before the court on Defendant Markel's Motion for Summary Judgment as to Plaintiffs' Second Amended Complaint and Defendant Markel's Counterclaim (ECF No. 94; "Markel's Motion") and Defendant KA Broadway LLC d/b/a Kiddie Academy Pearland East's ("KA Broadway") Motion for Summary Judgment as to Count II and III of Plaintiffs' Second Amended Complaint (ECF No. 95; "KA Broadway's Motion"). The court also has before it Plaintiffs' Response in Opposition to Markel's Motion and Cross Motion for Summary Judgment (ECF No. 97) and Plaintiffs' Response in Opposition to KA Broadway's Motion and Cross Motion for Summary Judgment (ECF No. 96). No hearing is necessary. Local Rule 105.6 (D. Md. 2021). For the reasons set forth herein, Markel's Motion will be denied. KA Broadway's Motion will also be denied. Plaintiffs' Cross Motion for Summary Judgment seeking a declaratory judgment

that both the general liability and the professional liability limits of insurance are available to respond to the *Lewis* litigation will be granted.  Plaintiffs' Cross Motion as to Count II and III of Plaintiffs' Second Amended Complaint will be granted.  Accordingly, the case shall proceed as to the remaining declaratory relief in Count I of Plaintiffs' Second Amended Complaint (ECF No. 37) and Counts I through V of the Counterclaim. (ECF No. 70.)

## BACKGROUND

### I.    Procedural History

On March 12, 2020, Plaintiffs Kiddie Academy Domestic Franchising, LLC ("KADF"), Essential Brands, Inc. ("Essential"), and Philadelphia Indemnity, filed suit against Markel and its insureds, Bullocks Bright Beginnings, LLC, and Corey and Summer Bullock (collectively the "Bullocks"), and KA Broadway.  In the original and First Amended Complaint, Plaintiffs sought declaratory judgment that Markel owed additional amounts toward settlement of the suit involving KA Broadway (the "*Lewis* litigation"), and that Markel would owe a certain amount in an ongoing suit involving the Bullocks (the "*McNeel* litigation"), when that suit is eventually resolved.  On November 19, 2020, by order at ECF No. 34, the court granted in part and denied in part Markel's Motion to Dismiss the Amended Complaint.  (ECF Nos. 5, 17.)  The court dismissed Plaintiffs' claims related to the *McNeel* litigation and, accordingly, the Bullocks were terminated as parties in this case.  The court granted Plaintiffs leave to file a Second Amended Complaint.  (ECF No. 34.)

On January 12, 2021, Plaintiffs Philadelphia Indemnity, KADF, and KADF's parent company, Essential, filed their Second Amended Complaint against Markel and the daycare franchisee, KA Broadway (ECF No. 37; "the Complaint.")  In Count I, all three Plaintiffs seek declaratory judgment that Markel is obligated to pay an additional $1,000,000 toward settlement

of the *Lewis* litigation.  In Count II, KADF and Essential seek contractual indemnification from KA Broadway for the amount Philadelphia Indemnity was required to pay on their behalf toward the settlement.  In Count III, Philadelphia Indemnity asserts a claim for equitable subrogation against KA Broadway.  Following the filing of the Complaint, KA Broadway and Markel filed motions seeking dismissal of the claims against them on separate grounds.  On June 14, 2021, the court denied both motions.  (ECF No. 60.)

On July 26, 2021, KA Broadway filed an Answer (ECF No. 71) and Markel filed an Answer and Counterclaim.  (ECF No. 70.)  Markel sets forth five counts for declaratory judgment in its Counterclaim.  On May 31, 2022, Markel filed a Motion for Summary Judgment as to Count I of the Complaint and Counts I and II of its Counterclaim.  (ECF No. 94.)  Plaintiffs filed a Response in Opposition and Cross Motion for Summary Judgment requesting declaratory judgment that the professional liability coverage and general liability coverage limits of the Markel Policy (the "Policy") are available for the *Lewis* litigation.  (ECF No. 97.)  On June 1, 2022, KA Broadway filed a Motion for Summary Judgment as to Counts II and III of the Complaint.  (ECF No. 95.)  Plaintiffs filed a Response in Opposition and Cross Motion for Summary Judgment as to Counts II and III of the Complaint.  (ECF No. 96.)

## II. Franchise Agreement Between KADF and KA Broadway

The Complaint alleges that, on or about November 7, 2013, Plaintiff KADF and Defendant KA Broadway entered into a Franchise Agreement under which KADF granted KA Broadway the right to operate a Kiddie Academy Child Care Learning Center in Pearland, Texas.  (ECF No. 37 ¶ 9.)  Paragraph 14 of the Franchise Agreement required KA Broadway to procure:

> 14.2.1 Comprehensive general liability insurance, including, without limitation, personal injury, premises liability, errors and omissions, products/completed operations, fire and contractual liability in the amount of One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) in the aggregate.

3

14.2.2 Teachers' professional liability insurance in the amount of One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) in the aggregate, separate and apart from the comprehensive general liability insurance limits.

14.2.9 Umbrella liability insurance (commonly referred to as excess liability insurance) in the amount of no less than Three Million Dollars ($3,000,000) per occurrence and Three Million Dollars ($3,000,000) in the aggregate.

(ECF No. 96-1, PIIC/KADF 001780-001781.)

The Franchise Agreement includes a provision relating to the franchisee's duty to indemnify the franchisor.  Paragraph 21 of the Franchise Agreement provides:

. . . Franchisee will indemnify and hold Franchisor and Franchisor's members, managers, officers, directors and employees harmless against and from any and all claims arising either directly or indirectly from, as a result of, or in connection with the operation of the Franchised Business, as well as the costs, including attorneys' fees, of defending against them . . .

(ECF No. 96-1, PIIC/KADF 001799.)

## III.    Lewis Litigation

On or about October 27, 2017, Robert Lewis, individually and as next friend of minor child K.L., filed suit in the District Court of Brazoria County, Texas, against KA Broadway, KADF, and Essential.  (ECF No. 37 ¶ 12.)  *See Robert Lewis, et al. v. KA Broadway, LLC, et al.*, No. 93954-CV (Dist. Ct. Tex. 2017).   In that case, plaintiff Lewis alleged that the defendants were negligent and grossly negligent in actions or omissions that caused injury to K.L., who was injured while participating in an art activity when she was in daycare at the facility operated by KA Broadway. *Id.* ¶ 14.

At the time of the *Lewis* lawsuit, KADF and Essential were insured directly by Philadelphia Indemnity under a Commercial General Liability Policy with limits of liability of $1,000,000, as well as a Commercial Umbrella Liability Policy with limits of liability of $10,000,000.  (ECF No. 37 ¶¶ 22-23.)  KA Broadway was insured by Markel under a Commercial General Liability Policy

4

with a limit of $1,000,000, as well as an Umbrella Liability Policy with a limit of $3,000,000.  *Id.* at ¶¶ 18, 20.

The Commercial General Liability Policy issued by Markel to KA Broadway includes a Texas Professional Liability Coverage Endorsement.  (ECF No. 94-3.)  The Texas Professional Liability Endorsement modified the Commercial General Liability Coverage form and provides:

The following changes apply only to the coverage provided by this endorsement.

A. The following is added to Section I – Coverages:

**MISCELLANEOUS PROFESSIONAL LIABILITY**

**1.** Insuring Agreement

**a.** We will pay those sums that the insured becomes legally obligated to pay as "damages" because of injury arising out of a "wrongful act" of the insured or of any other person for whose acts the insured is legally liable, to which this insurance applies. …

**b.** This insurance applies to injury only if:
(1) The injury is caused by a "wrongful act" that takes place in the "coverage territory";
(2) The injury occurs during the policy period; and
(3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or received notice of a "wrongful act" or claim, knew that the injury had occurred, in whole or in part.

D. Section III – Limits of Insurance is replaced by the following:

**LIMITS OF INSURANCE**

**4.** The limits of insurance provided by this endorsement are in addition to the limits of insurance provided by the Commercial General Liability Coverage Form

The coverage provided by this endorsement does not provide any duplication or overlap of coverage for the same claim or "suit".  Two or more claims arising out of a single "wrongful act" or a series of interrelated "wrongful acts" will be treated as a single claim.

(ECF No. 94-3, MIC00214, MIC00219.)

On or about September 5, 2019, KA Broadway, Essential, and KADF agreed to settle the *Lewis* litigation by paying a total sum of $6,000,000 to Mr. Lewis.  (ECF No. 37 ¶ 34.)  To achieve this settlement, Markel paid $1,000,000 in professional liability coverage under the Commercial General Liability Policy issued to KA Broadway and $3,000,000 from the Umbrella Policy issued to KA Broadway.  *Id.* ¶ 26.  Philadelphia Indemnity paid $1,000,000 in general liability coverage under the Commercial General Liability Policy issued to KADF and Essential; and $1,000,000 under the Umbrella Policy issued to KADF and Essential.  *Id.* ¶ 27.  Following the settlement, all parties to the *Lewis* litigation entered a Release Agreement which set forth "material terms regarding agreements and reservation of rights related to a settlement" of the *Lewis* case.  (ECF No. 96-2, p. 1.)

## LEGAL STANDARD

### I.    <u>Federal Rule of Civil Procedure 56</u>

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id*. at 249.  Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v.*

*Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).  This court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

In undertaking this inquiry, this court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007).  This court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Adin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage).  Indeed, it is the function of the fact-finder to resolve factual disputes, including issues of witness credibility. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866-68 (2014).

When adverse parties file cross-motions for summary judgment, as is the case here, this court applies the same standard of review to both motions, considering "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Bacon v. City of Richmond, Va.*, 475 F.3d 633, 638 (4th Cir. 2007)).  "[B]y the filing of a motion [for summary judgment,] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Brown v. Perez*, 835 F.3d 1223, 1230 n.3 (10th Cir. 2016) (citation omitted); *see also Sherwood v. Washington Post,* 871 F.2d 1144, 1148 n.4 (D.C. Cir. 1989) ("[N]either party waives the right to a full trial on the merits by filing its own motion.").  "However, when cross-motions for summary judgment demonstrate a basic agreement concerning what legal theories and

material facts are dispositive, they "may be probative of the non-existence of a factual dispute." *Syncrude Canada Ltd. v. Highland Consulting Group, Inc.*, 916 F. Supp. 2d 620, 624 (D. Md. 2013).

## ANALYSIS

### I.     Markel Motion (ECF No. 94)

Markel argues it is entitled to summary judgment on Count I of the Complaint and Counts I and II of its Counterclaim because the Policy prohibits stacking of coverage for the same lawsuit. (ECF No. 94-1, p. 2.) Markel further argues that its contribution of $1,000,000 toward settlement of the *Lewis* litigation fully exhausted the limits available under the Policy. (ECF No. 94-1, p. 7.)

### A.     *Choice of Law*

When exercising diversity jurisdiction, as the court is here, federal courts apply the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941); *DiFederico v. Marriott Int'l, Inc.*, 714 F.3d 796 (4th Cir. 2013). Maryland adheres to the doctrine of *lexi loci contractus*, which provides that "the law of the jurisdiction where the contract was made controls its validity and construction." *Kramer v. Bally's Park Place, Inc.*, 311 Md. 387, 390 (1988). "The *locus contractu* of an insurance policy is the state in which the policy is delivered and the premiums are paid." *Aetna Cas. & Sur. Co. v. Souras*, 78 Md. App. 71, 77 (1989).

Markel delivered the insurance policy to KA Broadway in Texas and KA Broadway paid its premiums in Texas. (ECF No. 94-1, p. 6.) Thus, Texas law governs Markel's Motion.

### B.     *Declaratory Judgment*

The Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes a district court to "declare the rights and other legal relations of any interested party seeking such declaration." "Insurance coverage disputes are often resolved in an action for declaratory judgment." *Alea London Ltd. v.*

*Bickford*, 627 F. Supp. 2d 763, 767 (S.D. Tex. 2009). Insurance contracts are governed by the same rules of construction as other contracts. *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995). "However, § 2201 is a procedural provision only extending to controversies within the jurisdiction of the federal courts." *Id.* Thus, a federal court "may not entertain declaratory judgment actions unless there is an independent basis for subject matter jurisdiction." *Id.* The present case is based upon diversity of citizenship under 28 U.S.C. § 1332; accordingly, the requests for declaratory relief are properly before the court.

"Texas law provides that insurance policies are construed according to common principles governing the construction of contracts, and the interpretation of an insurance policy is a question of law for a court to determine." *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 562 (5th Cir. 2010); *see also Hart v. United States*, 945 F. Supp. 1009, 1011 (E.D. Tex. 1996) (providing that contract interpretation, including whether a contract is ambiguous, is a question of law). "Where the language of a contract is clear, a court's inquiry should begin and end with the policy's language." *Nautilus Ins. Co. v. Country Oak Apts. Ltd.*, 566 F.3d 452, 455 (5th Cir. 2009). In other words, "[i]f the written instrument is worded so that it can be given only one construction, it will be enforced as written." *Upshaw v. Trinity Cos.*, 842 S.W.2d 631, 633 (Tex. 1992). Moreover, "[i]f a contract as written can be given a clear and definite legal meaning, then it is not ambiguous as a matter of law." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 133 (Tex. 2010).

In contrast, a contract is considered ambiguous if it is susceptible to two or more reasonable interpretations and "only when the application of pertinent rules of interpretation to the face of the instrument leave[] it genuinely uncertain which one of two or more meanings is the proper meaning." *Pogo Res., LLC v. St. Paul Fire & Marine Ins. Co.*, No. 19-CV-2682, 2022 U.S. Dist.

LEXIS 16564, at *29 (N.D. Tex. Jan. 31, 2022) (quoting *RSUI Indem. Co. v. Lynd Co.*, 466 S.W. 3d 113, 119 (Tex. 2015)).  Importantly, however, "[a] writing is not ambiguous because the parties disagree about its interpretation." *Hart*, 945 F. Supp. at 1011.  "If only one party's construction is reasonable, the policy is unambiguous and [the court] will adopt that party's construction . . . [b]ut if both constructions present reasonable interpretations of the policy's language, [the court] must conclude that the policy is ambiguous." *RSUI Indem. Co.*, 466 S.W. 3d at 119.  "In Texas, when an insurance policy is ambiguous or inconsistent, the construction that would afford coverage to the insured must govern." *Mid-Continent Cas. Co. v. Swift Energy Co.*, 206 F.3d 487, 491 (5th Cir. 2000).

"When construing the provisions of a policy, the court must 'examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless.'" *Pogo Res., LLC*, 2022 U.S. Dist. LEXIS 16564, at *28 (quoting *Gilbert*, 327 S.W.3d at 126).  "Under Texas law, an insurance policy 'must be considered as a whole, and each part given effect and meaning.'" *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 558 (5th Cir. 2004) (quoting *Valmont Energy Steel, Inc. v. Com. Union Ins. Co.*, 359 F.3d 770, 773 (5th Cir. 2004)). "[A]n endorsement cannot be read apart from the main policy, and the added provisions will supersede the previous policy terms to the extent they are truly in conflict." *U.E. Texas One-Barrington, Ltd. v. Gen. Star Indem. Co.*, 243 F. Supp. 2d 652, 661 (W.D. Tex. 2001).  All of the provisions should be considered together and "[n]o one phrase, sentence, or section of a contract should be isolated from its setting and considered apart from the other provisions." *Pogo Res., LLC*, 2022 U.S. Dist. LEXIS 16564, at *28 (quoting *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257 (Tex. 2017)).  "Endorsements to a policy generally supersede and control over conflicting printed terms within the main policy; however, the provisions found in the main policy

and endorsement should be construed together unless doing so would negate or render superfluous the additional coverage afforded in the endorsement." *Id.* (quoting *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 115 (5th Cir. 2010)) (internal citations omitted).  Additionally, "[a]n endorsement to an insurance policy controls the policy insofar as it enlarges, modifies, or restricts the terms of the policy, and if there is any conflict between the rider and the policy, the rider controls in construing the contract especially where the provisions of the rider are more specific." *Id.* (quoting *Penthouse Owners Ass'n, Inc. v. Certain Underwriters*, 612 F.3d 383, 386 (5th Cir. 2010)).

### i.     Count I of the Complaint and Count II of Counterclaim[1]

Markel argues that it is entitled to summary judgment as to Count I the Complaint because the Professional Liability Coverage Endorsement ("PL Endorsement") expressly provides that the PL Endorsement does not provide duplication or overlap of coverage for the same lawsuit.  (ECF No. 94-1, p. 8.)  Markel argues that it is entitled to summary judgment as to Count II[2] of its Counterclaim for the same reasons.  In response, Plaintiffs argue precisely the opposite to be the case—that the Policy expressly provides for stacking.  (ECF No. 97, p. 10.)

The crux of the dispute concerns the correct interpretation of Paragraph D. Limits of Insurance in the PL Endorsement.  The court agrees with the parties that the PL Endorsement is clear and unambiguous.[3]  Accordingly, the interpretation of the insurance policy is a question of law for this court.

---

[1] The court notes that Markel's Motion as to Count I of Plaintiffs' Second Amended Complaint and Count II of its Counterclaim raises arguments nearly identical to those in Plaintiffs' Cross Motion for Summary Judgment. Accordingly, for purposes of efficiency, the court will address these motions together.
[2] In Count II of the Counterclaim, Markel seeks declaratory judgment that Markel's Primary Policy precludes stacking of coverages and limits.  (ECF No. 70, p. 27.)
[3] *See Hart v. United States*, 945 F. Supp. 1009, 1011 (E.D. Tex. 1996), *supra*.

### a.    The Abuse Endorsement

As an initial matter, Markel argues that the PL Endorsement, as part of the Commercial General Liability Coverage Form ("CGL Form"), is subject to the Abuse or Molestation Coverage Endorsement ("Abuse Endorsement"), and, therefore, the anti-stacking provision in the Abuse Endorsement applies to the entire Policy, including the PL Endorsement.  Plaintiffs contend that the Abuse Endorsement cannot be read to modify the PL Endorsement.

The Abuse Endorsement provides:

> The coverage provided by this endorsement does not provide any duplication or overlap of any other coverage provided elsewhere in this policy.  No coverage is provided for abuse, molestation, or exploitation under this policy except as provided in this endorsement.

and

> **Multiple Coverage Forms Or Policies Issued By Us**
>
> When two or more Coverage Forms or policies issued by us or any other Markel Corporation owned or operated insurance company apply to the same claim, "suit" or loss, the maximum limits of our liability under all such Coverage Forms or policies combined shall not exceed the highest applicable limit of liability under any one Coverage Form or policy among them.

(ECF No. 94-3, MIC000221-22.)

In *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, the court examined an insurance policy that included a base policy and two endorsements, and concluded that two endorsements could not be merged together.  382 F.3d 546, 558 (5th Cir. 2004).  The court reasoned: "there is no mention anywhere in the policy that the Saline Endorsement is modified or conditioned on the Pollution Endorsement."  *Id.*  Additionally, the court acknowledged that because the plaintiffs "paid two separate premiums for two separate coverages, one endorsement cannot be read to be dependent on the other . . . [e]ither endorsement could have been purchased separately, as there was no

requirement that an insured was compelled to purchase both together." *Id.*  Importantly, the court explained that the defendant "could have drafted the endorsements in a manner so as to make the Saline Endorsement subject to the conditions found in the Pollution Endorsement." *Id.*

Markel argues that the Abuse Endorsement modifies the CGL Form which then applies to the PL Endorsement.  The court disagrees.  "Each coverage provision of each policy, along with its respective definitions and exclusions, must be read as separate and distinct." *M.J.R. Corp. v. Scottsdale Ins. Co.*, 803 S.W.2d 426, 430 (5th Cir. 1991).  "Although an attachment to an insurance policy upon a separate sheet of paper and the policy are to be construed together, and as one, it by no means follows that they constitute an indivisible contract." *Id.*  "They are in fact two distinct contemporaneous contracts . . . [t]hus, the language of one of the contracts cannot be used to preclude the application of coverage under the other." *Id.*

The language of the Abuse Endorsement provides that "[t]his endorsement modifies insurance provided under the following: COMMERCIAL GENERAL LIABILITY COVERAGE FORM." (ECF No. 94-3, MIC000220.)  There is no mention in the Policy that the PL Endorsement is modified by the Abuse Endorsement.  *See Primrose*, *supra*.  Additionally, Plaintiffs provided evidence that the Abuse Endorsement and the PL Endorsement were paid for separately (ECF No. 97-3), further confirming that one endorsement shall not be construed as dependent on the other. *Primrose*, 382 F.3d at 558.   Further, Markel could have drafted the PL Endorsement in a manner to make it subject to the anti-stacking provision found in the Abuse Endorsement.  Markel did not do so and cannot now be heard to assert that the PL Endorsement is subject to the provisions in the Abuse Endorsement.  Nothing within the language of the Policy indicates that the provisions regarding limits of insurance in the Abuse Endorsement apply to the PL Endorsement – or conversely, that the PL Endorsement is subject to the limits described in the Abuse Endorsement.

As Plaintiffs note, the Policy does not direct the insured to the Abuse Endorsement, which on its face has no applicability to the PL Endorsement, to determine what limit is applicable. Accordingly, construing the plain language of the Policy, the court finds that the Multiple Coverage Forms provision does not affect the limits of insurance provision in the PL Endorsement or otherwise modify its terms.

### b.  The Professional Liability Endorsement

Markel also argues it is entitled to summary judgment as to Count I of the Complaint and Count II of its Counterclaim because the PL Endorsement expressly prohibits stacking. (ECF No. 94-1, p. 8.) In response, Plaintiffs argue that the Policy expressly provides for stacking. (ECF No. 97, p. 10.)

The PL Endorsement provides:

> **LIMITS OF INSURANCE**
> **1.** The limits of insurance shown in the Schedule of this endorsement and the rules below fix the most we will pay regardless of the number of:
>> **a.** Insureds;
>> **b.** Claims made or "suits" brought; or
>> **c.** Persons or organizations making claims or bringing "suits".
>
> **2.** The Aggregate limit shown in the Schedule of this endorsement is the most we will pay for the sum of all "damages" because of all injury during the policy period.
> **3.** Subject to Paragraph 2. above, the Each Wrongful Act limit shown in the Schedule of this endorsement is the most we will pay for the sum of all "damages" because of all injury arising out of any one "wrongful act" or a series of interrelated "wrongful acts".
> **4.** *The limits of insurance provided by this endorsement are in addition to the limits of insurance provided by the Commercial General Liability Coverage Form.*
>
> The limits of insurance of this endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the limits of insurance.
>
> *The coverage provided by this endorsement does not provide any duplication or overlap of coverage for the same claim or "suit".* Two or more claims arising out

of a single "wrongful act" or a series of interrelated "wrongful acts" will be treated as a single claim. All such claims, whenever made, will be considered to be first made on the date on which the earlier claim arising out of such "wrongful act" was first made. All such claims are subject to the same limit of insurance. All claims arising out of one "wrongful act" to the same person by one or more insured(s) will be deemed to be one claim and to have been made at the time the first of those claims is made against any insured.

(ECF No. 94-3, MIC 000218 – MIC 000219) (emphasis added).

In support of its argument that the PL Endorsement prohibits stacking, Markel relies on the following language: "The coverage provided by this endorsement does not provide any application or overlap of coverage for the same claim or 'suit.'"  (ECF No. 94-1, p. 8.; ECF No. 94-3, MIC 000219.)  In support of their opposing position, Plaintiffs rely on the language that states "The limits of insurance provided by this endorsement are in addition to the limits of insurance provided by the Commercial General Liability Coverage Form."  (ECF No. 97, p. 9; ECF No. 94-3, MIC 000219.)

The PL Endorsement provides that only one limit of PL coverage applies for all claims arising from a single wrongful act or multiple related wrongful acts; however, the PL Endorsement also expressly contemplates that the PL Endorsement coverage and CGL Form coverage may be stacked.  Accordingly, Markel's Motion for Summary Judgment as to Count I of the Complaint and Count II of the Counterclaim is denied, and Plaintiffs' Cross Motion for Summary Judgment is granted.

### ii.    Count I of Counterclaim

Markel also argues it is entitled to summary judgment on Count I[4] of its Counterclaim because it paid the entire $1,000,000 available for each wrongful act under the PL Endorsement toward the *Lewis* litigation settlement on behalf of KA Broadway, Essential and KADF.  (ECF

---

[4] Count I of the Counterclaim seeks declaratory judgment that Markel's Policies are exhausted by payment of $1,000,000 toward settlement of the *Lewis* litigation.  (ECF No. 70, p. 26.)

No. 94-1, p. 7.)  Markel relies on Paragraph D. Limits of Insurance of the PL Endorsement.  (ECF No. 94-1, p. 7; MIC 000214.)  Plaintiffs argue that Markel misconstrues the PL Endorsement, and that the endorsement, when properly construed, establishes that there is only one limit of professional liability coverage for all claims or suits that arise from a single wrongful act – and that it does not refer to coverage that may be provided elsewhere in the Policy.  (ECF No. 97, p. 10.)

As stated above, the provisions of the Policy are clear.  The PL Endorsement coverage and CGL Form coverage may be stacked; therefore, both are available to pay toward settlement of the *Lewis* litigation.  Accordingly, for the same reasons the court denies Markel's Motion for Summary Judgment as to Count I of the Complaint and Count II of its Counterclaim, the court denies Markel's Motion as to Count I of the Counterclaim.

## II.   KA Broadway's Motion  and Plaintiffs' Cross Motion

When exercising diversity jurisdiction, as the court is here, federal courts apply the choice-of-law rules of the forum state.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941); *DiFederico v. Marriott Int'l, Inc.*, 714 F.3d 796 (4th Cir. 2013).  Maryland adheres to the doctrine of *lexi loci contractus*, which provides that "the law of the jurisdiction where the contract was made controls its validity and construction."  *Kramer v. Bally's Park Place, Inc.*, 311 Md. 387, 390 (1988).  "A contract is made where the last act necessary to make the contract binding occurs."  *Konover Prop. Trust, Inc. v. WHE Assocs., Inc.*, 142 Md. App. 476, 490 (2002).  "Generally, the last act is a party's signature."  *Baker v. Antwerpen Motorcars Ltd.*, 807 F. Supp. 2d 386, 389 n. 13 (D. Md. 2011).  The Release Agreement was signed in Maryland.  (ECF No. 96-2.)  Therefore, Maryland law applies to KA Broadway's Motion.

### A.     Contractual Indemnification (Count II)

KA Broadway moves for summary judgment as to Count II of the Complaint.  In Count II, Plaintiffs Essential and KADF assert that KA Broadway breached the terms of the Franchise Agreement by requiring Essential and KADF to pay $2,000,000 toward settlement of the *Lewis* litigation.  (ECF No. 37, ¶¶ 49-50.)  Essential and KADF contend they are entitled to indemnification from KA Broadway for those amounts paid toward the settlement.  *Id.* ¶ 52.

### i.     KA Broadway's Motion

KA Broadway argues it is entitled to summary judgment because, pursuant to the Release Agreement, Plaintiffs' claim for contractual indemnification against KA Broadway is barred by mutual assent and the specific intent of the parties.  (ECF No. 95-1, p. 6.)  In response, Plaintiffs argue that contractual indemnification was expressly reserved to KADF and Essential in the Release Agreement, and no matter the limitation of the contractual indemnification remedy, KADF and Essential are free to plead and prove entitlement to that remedy.  (ECF No. 96, p. 3.)

"Under Maryland law, the interpretation of a contract is 'ordinarily a question of law for the court.'"  *Kantsevoy v. LumenR LLC*, 301 F. Supp. 3d 577, 594 (D. Md. 2018) (quoting *Grimes v. Gouldmann*, 232 Md. App. 230, 235 (2017)). "[T]o determine the parties' intentions, courts first look to the written language of the contract."  *Id.* at 595.  "[T]he written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding."  *Slice v. Carozza Props., Inc.*, 215 Md. 357, 368 (1958).

The Franchise Agreement provides:

. . . Franchisee will indemnify and hold Franchisor and Franchisor's members, managers, officers, directors and employees harmless against and from any and all claims arising either directly or indirectly from, as a result of, or in connection with the operation of the Franchised Business, as well as the costs, including attorneys' fees, of defending against them . . .

(ECF No. 96-1, PIIC/KADF 001799.)

The Release Agreement states:

. . . Kiddie Academy Domestic Franchising, LLC and Essential Brands, Inc. retain all rights arising in common law, contractual indemnification, and/or subrogation but agree that their sole remedy for such claims will be such insurance benefits that are available to KA Broadway LLC d/b/a Kiddie Academy Pearland East.

(ECF No. 96-2, p. 2.)

In support of its argument that the indemnification claim is barred, KA Broadway argues that the Release Agreement "clearly shows that the specific intent of the parties following the Lewis litigation settlement, was that KADF and Essential Brand's sole remedy for all claims will be only the insurance benefits that are available to KA Broadway." (ECF No. 95-1, p. 7.)

According to the plain language of the Franchise Agreement, KA Broadway may be required to indemnify Essential and KADF, but such indemnification is limited to the coverage limits of the Policy (plus costs and fees). While the remedy may be limited, the Policy does not bar KADF and Essential's contractual indemnification claim. Accordingly, KA Broadway's Motion for Summary Judgment as to Count II of the Complaint is denied.

### ii.      Plaintiffs' Cross Motion

Plaintiffs argue they are entitled to summary judgment because the claim for contractual indemnification was expressly reserved to KADF and Essential in the Release Agreement, and while the remedy may be limited, it does not bar their contractual indemnification claim. (ECF No. 96, p. 3.) Further, there is no dispute between the parties that KA Broadway did not contractually indemnify KADF and Essential.

"A right of indemnification can arise by express agreement or by implication." *Hanscome v. Perry,* 74 Md. App. 605, 615 (1988).  "As with any contract clause, a court construes language of an indemnification provision in accordance with its customary, ordinary, and accepted meaning." *Bd. of Trs. Cmty. Coll. of Balt. Cnty. v. Patient First Corp.,* 444 Md. 452, 466 (2015) (citing *Atl. Contracting & Material Co. v. Ulico Cas. Co.,* 380 Md. 285, 300-301 (2004)).

As set forth above, the Indemnification Provision in the Franchise Agreement provides:

> . . . Franchisee will indemnify and hold Franchisor and Franchisor's members, managers, officers, directors and employees harmless against and from any and all claims arising either directly or indirectly from, as a result of, or in connection with the operation of the Franchised Business, as well as the costs, including attorneys' fees, of defending against them . . .

(ECF No. 96-1, PIIC/KADF 001799.)

> Under Maryland law:

> indemnity agreements may provide (1) indemnity against loss or damage, under which the indemnitee may not recover until it has made payment or otherwise suffered an actual loss or damage within the scope of the indemnity; (2) indemnity against liability, under which an action may be brought as soon as the liability is legally imposed, as when judgment is entered, even though no actual loss has yet been sustained (the judgment has not been paid); or (3) a promise by the indemnitor 'to perform a certain act or make specified payments for the benefit of the indemnitee,' under which an immediate right of action accrues upon the failure of the indemnitor to perform, regardless of whether any actual damage has been sustained . . . [t]he nature of the indemnity will determine not only when a right of action accrues but also the measure of damages that may be recovered.

*Pulte Home Corp. v. Parex Inc.*, 403 Md. 367, 381-82 (2008).

Based on the plain language of the Franchise Agreement indemnity provision, Plaintiffs' indemnification claim accrued when it was determined that (1) KADF and Essential were liable for any claims in the *Lewis* litigation; and (2) liability was caused by KA Broadway.  Further, there is no dispute that $2,000,000 was paid on behalf of Essential and KADF to settle the *Lewis* litigation.  As stated above, the language of the Release Agreement expressly reserves the claim

for contractual indemnification.[5]  Additionally, there is no dispute (1) that the parties entered into a Franchise Agreement with an indemnification provision; or (2) that the *Lewis* litigation claims, and resulting liabilities, arose from operation of the daycare.  Accordingly, KADF and Essential properly assert a claim for contractual indemnification against KA Broadway.

"Under Maryland law, the elements of a claim for breach of contract are contractual obligation, breach, and damages."  *Kantsevoy v. LumenR LLC*, 301 F. Supp. 3d 577, 596 (D. Md. 2018).  To prevail on an action for breach of contract, "a plaintiff must prove 'that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation.'"  *Harig v. Progress Rail Servs. Corp.*, 166 F. Supp. 3d 542, 550 (D. Md. 2015) (quoting *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (Md. 2001)).  "In other words, '[i]t is the parties' agreement that ultimately determines whether there has been a breach.'"  *Id.* (quoting *Mathis v. Hargrove*, 166 Md. App. 286, 318-19 (2005)).

There is no dispute that KA Broadway has not indemnified Essential and KADF for the $2,000,000 paid to settle the *Lewis* litigation, thereby, resulting in a breach of the Franchise Agreement.  Accordingly, Plaintiffs' Cross Motion for Summary Judgment as to Count II of the Second Amended Complaint is granted.

---

[5] Markel further argues that if the court were to find ambiguities in the Franchise Agreement, Maryland law directs the court to construe the contract against its drafter.  (ECF No. 95-1, p. 7.)  The court does not find the language of the Release Agreement ambiguous.  In any event, the court notes the Release Agreement states:

> Construction.  The language used in this Agreement will be construed in all cases in accordance with ordinary usage and meaning.  The Parties acknowledge that each Party and its counsel have reviewed and revised this Agreement and that no single Party bears sole responsibility of the draftsmanship of this Agreement.  Consequently, no rule of construction to the effect that ambiguities are to be resolved against the drafting party should be employed in the interpretation of this Agreement.

(ECF No. 96-2, p. 3.)

### B.      Equitable Subrogation (Count III)

KA Broadway moves for summary judgment as to Count III of the Complaint.  In Count III, Philadelphia Indemnity asserts a claim for equitable subrogation, claiming that as a result of KA Broadway's negligence, Philadelphia Indemnity made payments on behalf of its insureds, Essential and KADF, towards the *Lewis* litigation settlement.  (ECF No. 37, ¶ 56.)  Philadelphia Indemnity claims that by virtue of that payment made on behalf of its insureds, and in accordance with the terms and conditions of its policies with those insureds, Philadelphia Indemnity is "legally, equitably, and contractually subrogated to the rights of its insureds to the extent of such payment."  (ECF No. 37, ¶ 57.)

### i.      KA Broadway's Motion

KA Broadway argues that the language of both the Release Agreement and Settlement Agreement demonstrates that Philadelphia Indemnity intended to waive the right to bring claims in subrogation against KA Broadway.  (ECF No. 95-1, p. 8.)  Therefore, KA Broadway argues, Philadelphia Indemnity failed to reserve the right to sue KA Broadway under an equitable subrogation theory.

Waiver is "the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from circumstances.  And acts relied upon as constituting a waiver of the provisions of a contract must be inconsistent with an intention to insist upon enforcing such provisions."  *Food Fair v. Blumberg*, 234 Md. 521, 531 (1964).  Waiver "must be clearly established and will not be inferred from equivocal acts or language.  Whether there has been a waiver of a contractual right involves a matter of intent that ordinarily turns on the factual circumstances of each case."  *Gold Coast Mall, Inc. v. Lamar Corp.*, 298 Md. 96, 109 (1983); *see Hovnanian Land Inv. Group, LLC*

*v. Annapolis Towne Ctr. at Parole*, LLC, 421 Md. 94, 122 (2011) ("the waiver inquiry requires resolution of many factual disputes and drawing of factual inferences."). "Whether waiver exists in a given case is normally a question for the trier of fact, for the determination of its existence *vel non* turns on the intent of the party ostensibly waiving the right, a state of mind which is to be derived from the facts and circumstances surrounding the purported relinquishment." *St Paul Fire & Marine Ins. Co. v. Molloy,* 219 Md. 139, 145 (1981). Thus, the court must determine whether, in including provisions expressly retaining a right with respect to Markel, the parties to these contracts intended that Philadelphia Indemnity would release all claims in subrogation against KA Broadway.

KA Broadway's argument is grounded in the express language of the Settlement Agreement and Release Agreement, such that the agreements included express provisions that Philadelphia Indemnity retained a right to bring an action against Markel, but did not include similar provisions with respect to KA Broadway. Further, KA Broadway argues that the absence of such language constitutes a waiver of Philadelphia Indemnity's entitlement to bring an equitable subrogation claim.

The Settlement Agreement states:

Philadelphia [Indemnity] shall have the right to pursue a direct claim against Markel for this coverage dispute concerning the applicable primary policy limits, and neither the mutual releases in the Settlement Agreement nor any statutory or common law shall operate to waive, compromise, or prejudice such claim by Philadelphia [Indemnity].

(ECF No. 96-3, p. 1.)

The Release Agreement states:

Philadelphia shall have the right to pursue a direct claim against Markel for this coverage dispute concerning the applicable primary policy limits, and neither the mutual releases in this Agreement nor in the Confidential Settlement Agreement, General Release and Indemnification Agreement between the Plaintiffs and the various Defendants in the

Lawsuit, nor any statutory or common law shall operate to waive, compromise, or prejudice such claim by Philadelphia.

(ECF No. 96-2, p. 2.)

KA Broadway fails to proffer any facts or evidence regarding actions (or inactions) suggesting waiver by Philadelphia Indemnity for determination by a trier of fact, but rather rests its argument on the negative inference it asserts should be drawn by construction of the above-outlined contractual provisions.  The court agrees there is no dispute of fact as to the content of the parties' relevant agreements; however, KA Broadway fails to demonstrate entitlement to judgment as a matter of law.  Accordingly, KA Broadway's Motion as to Count III of the Complaint is denied.

### ii.    Plaintiffs' Cross Motion

Plaintiffs make three arguments in their Cross Motion for Motion Summary as to Count III of the Complaint.  First, Plaintiffs argue that KADF and Essential retained all rights, including subrogation, against KA Broadway.  (ECF No. 96, p. 5.)  Second, Plaintiffs argue that KADF and Essential assigned to Philadelphia Indemnity all of their rights against KA Broadway arising from the *Lewis* litigation.  *Id.*  Lastly, Plaintiffs argue that Philadelphia Indemnity's right of equitable subrogation against KA Broadway exists independent of the agreement between KADF/Essential and KA Broadway.  *Id.*

"Subrogation is founded upon the equitable powers of the court."  *Bachmann v. Glazer & Glazer, Inc.*, 316 Md. 405, 412 (1989).  "Subrogation substitutes one creditor for another, with the substitute creditor having only the rights of the previous creditor."  *Fishman v. Murphy*, 433 Md. 534, 553 (2013).  "[T]he object of subrogation is the prevention of injustice.  It is designed to promote and to accomplish justice and is the mode which equity adopts to compel the ultimate

payment of a debt by one, who, in justice, equity, and good conscience should pay it." *Hill v. Cross Country Settlements, LLC.*, 402 Md. 281, 312 (2007).

"Maryland law recognizes three kinds of equitable subrogation: legal subrogation, which arises by operation of law; conventional subrogation, which arises by an express or implied agreement; and statutory subrogation, which arises from a legislative enactment." *Selective Way Ins. Co. v. Nationwide Prop. & Cas. Ins. Co.*, 242 Md. App. 688, 733 n. 11 (2019). "Equitable subrogation arises by operation of law when a person pays the debt of another under such circumstances that equity entitles that person to reimbursement." *Fireman's Fund Ins. Co. v. Continental Ins. Co.*, 308 Md. 315, 319 (1987).

"Legal subrogation is a creature of equity not depending upon contract, but upon the equities of the parties. In its most usual aspect, it arises by operation of law where one having a liability or a right or a fiduciary relation in the premises pays a debt owing by another under such circumstances that he is in equity entitled to the security or obligation held by the creditor whom he has paid." *Security Ins. Co. v. Mangan*, 250 Md. 241, 246 (1968).

"Legal subrogation applies to cases where a third party, to protect its own interests, pays the debt of another." *Fishman v. Murphy*, 433 Md. 534, 553 (2013). Further, it "may apply even in the absence of an express or implied agreement." *Id.* Under Maryland law, "the elements of legal subrogation are: (1) the existence of a debt or obligation for which a party, other than the subrogee, is primarily liable, which (2) the subrogee, who is neither a volunteer nor an intermeddler, pays or discharges in order to protect his own rights or interests. *Pulte Home Corp. v. Parex, Inc.*, 174 Md. App. 681, 743 (2007). "To obtain reimbursement, the subrogee must prove the existence of a debt for which another person was primarily liable and payment of that debt to protect its own rights and interests." *Fireman's Fund Ins. Co.*, 308 Md. at 319. "If these

24

requirements are met, the doctrine of equitable subrogation entitles the subrogee to all rights of its subrogor." *Id.*

Philadelphia Indemnity's equitable subrogation claim arises by operation of law.  First, KA Broadway's debt arises from its contractual indemnification obligations to Essential and KADF pursuant to the Franchise Agreement.  Second, it is undisputed that Philadelphia Indemnity paid $2,000,000 of KA Broadway's debt, owed to Essential and KADF, in settlement of the *Lewis* litigation.  Therefore, the doctrine of equitable subrogation entitles Philadelphia Indemnity to all rights of Essential and KADF.[6]

No genuine disputes of material fact exists as to Count III of the Complaint and Philadelphia Indemnity is entitled to judgment as a matter of law as to its right and entitlement to subrogation of the rights of its insureds, KADF and Essential, as against KA Broadway. Accordingly, Plaintiffs' Cross Motion as to Count III of the Complaint is granted.

## CONCLUSION

For the reasons set forth herein, Markel's Motion as to Count I of the Complaint and Counts I and II of the Counterclaim will be denied; KA Broadway's Motion as to Counts II and III of the Complaint will be denied; Plaintiffs' Cross Motion as to declaratory judgment that both the general liability and the professional liability limits are available to respond to the *Lewis* litigation will be granted; and Plaintiffs' Cross Motion as to Counts II and III of the Complaint will be granted. Accordingly, this case shall proceed as to the remaining requested declaratory relief in Count I of

---

[6] The court further notes that in support of their subrogation argument, Philadelphia Indemnity argues that because Essential and KADF assigned to it their rights against KA Broadway, Philadelphia Indemnity has the same indemnification rights as Essential/KADF to require KA Broadway to pay the $2,000,000.  (ECF No. 96, p. 4.) "Although an assignment can result in conventional subrogation, an assignment is not a requirement for legal subrogation."  *Selective Way Ins. Co.*, 242 Md. App. at 737.  Legal subrogation "arises by operation of law where its elements are met, even without the consent of the subrogor."  *Id.*

the Second Amended Complaint (ECF No. 37); and the Counterclaim (ECF No. 70).

A separate order follows.

_____/s/_____
Julie R. Rubin
United States District Judge

January 5, 2023